## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

TAMEKIA FORTNER,                     )
                                     )
    Plaintiff,                       )
                                     )
v.                                   )          Case No. 2:19-cv-01409-NAD
                                     )
LOUIS DEJOY,                         )
*Postmaster General of the*          )
*United States*,                     )
                                     )
    Defendant.                       )

### MEMORANDUM OPINION AND ORDER GRANTING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the June 28, 2022 motion hearing, the court **GRANTS** Defendant Louis DeJoy's motion for summary judgment (Doc. 70).

### INTRODUCTION

During the relevant time period, Plaintiff Tamekia Fortner was an employee with the United States Postal Service (USPS), a federal employer.   Plaintiff Fortner filed an amended complaint against the Postmaster General,[1] alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., for

---

[1] When Fortner filed her initial complaint, the Postmaster General was Megan Brennan.   Doc. 1.   The current Postmaster General, Louis DeJoy, later was substituted as Defendant.   *See* Doc. 51 at 1 n.1.

discrimination, retaliation, and a retaliatory hostile work environment.   Doc. 37.

Fortner is an African American female, and alleges that the USPS discriminated against her based on her sex and race, and retaliated against her after she engaged in protected activity.   Doc. 37 at 5–9; Doc. 73-4 at 1–2.   Fortner alleges that, among other things, the USPS improperly required her to participate in performance meetings with her supervisor regarding attendance issues and disciplined her more harshly than other, similarly situated male employees and male employees of different races.   Doc. 37.

But, on Defendant's summary judgment motion (Doc. 70), the court concludes that there is no genuine issue as to any material fact on Fortner's claims for discrimination, retaliation, and a retaliatory hostile work environment because she cannot create a triable issue of fact for a jury on the "personnel action" or "adverse employment action" element of her claims.

## BACKGROUND

### A.   Procedural background

On August 27, 2019, Plaintiff Fortner initiated this action, alleging that in 2017 and 2018 the USPS (her employer) had discriminated against her based on her sex and race, and retaliated against her because of an Equal Employment Opportunity (EEO) complaint she had submitted in December 2017.   Doc. 1. Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties

consented to magistrate judge jurisdiction.   Doc. 19.

> ### 1.   The court's prior orders limiting Fortner's claims to discrimination and retaliation after April 7, 2018, and a related claim for a retaliatory hostile work environment

The court already has issued two orders that limited Fortner's claims.   *See* Doc. 34; Doc. 51.

On December 23, 2019, Defendant moved to dismiss some of Fortner's claims as unexhausted and untimely.   Doc. 12; *see* Doc. 23; Doc. 30.   The court then converted Defendant's motion to dismiss to a motion for summary judgment, and requested supplemental briefing.   Doc. 31; *see* Doc. 32; Doc. 33.

On August 20, 2020, the court granted in part and denied in part Defendant's summary judgment motion.   Doc. 34.   The court found that Fortner had submitted an EEO "Information For Pre-Complaint Counseling" form on May 22, 2018.   Doc. 34 at 3.   Consequently, the court ruled that some of Fortner's claims were unexhausted and untimely, but that Fortner's claims for discrimination and retaliation based on conduct after **April 7, 2018**, would proceed.[2]   Doc. 34 at 10

---

[2] Under Title VII, a federal employee is required to initiate administrative review of any alleged discrimination or retaliation within 45 days of the alleged wrongful conduct.   42 U.S.C. § 2000e-16(b); *see Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008).   To exhaust her administrative remedies, a federal employee "must initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."   *Murphree v. Commissioner*, 644 F. App'x 962, 965 (11th Cir. 2016).   And, to establish the required EEO counselor contact, "an individual must contact an agency official logically connected to the EEO process

(granting Defendant's summary judgment motion in part, and stating that "Fortner's independent claims for race-, sex-, or retaliation-based discrimination for the Infractions Claim, the Letter of Warning Claim, and the portions of the Performance Harassment Claim occurring prior to **April 7, 2018**, are DISMISSED WITH PREJUDICE" (emphasis altered)); *see also* Doc. 51 at 4, 8–9 (similar).

In that August 20, 2020 memorandum opinion, the court also ordered that Fortner could file a separate motion for leave to amend in order to allege a claim for a retaliatory hostile work environment.   Doc. 34 at 10.

Fortner then filed a motion (Doc. 35), the court granted her leave to amend her complaint (Doc. 36), and Fortner filed her amended complaint on September 4, 2020 (Doc. 37).   That amended complaint, which included a claim for a retaliatory hostile work environment in addition to the claims for discrimination and retaliation (Doc. 37), is the operative complaint on this pending summary judgment motion (Doc. 70).

On October 8, 2020, Defendant filed a second motion to dismiss, arguing again that some of Fortner's claims were unexhausted and untimely, and that Fortner's amended complaint included, "for the second time, claims which were not administratively exhausted and which ha[d] already been dismissed once by this

---

and exhibit an intent to begin the EEO process."   *Id.* (citing *Duke v. Slater*, EEOC Dec. 01A02129, 2000 EEOPUB LEXIS 3424, 2000 WL 732027, at *1 (E.E.O.C. May 22, 2000)).

Court."  Doc. 43 at 1.  Defendant also argued that Fortner's amended complaint included a new claim that was not administratively exhausted.  Doc. 43 at 1; *see* Doc. 49 (Fortner's opposition brief).

On February 5, 2021, the court granted in part and denied in part Defendant's second motion to dismiss.  Doc. 51.  In that February 5, 2021 memorandum opinion, the court repeated its conclusion dismissing Fortner's discrimination and retaliation claims to the extent that those claims were based on conduct before **April 7, 2018**, but the court did allow Fortner's retaliatory hostile work environment claim to proceed.  Doc. 51 at 4, 8–9, 12 n.8, 13.

The court limited Fortner's alleged claims to the following:  (1) a sex and race discrimination claim related to both alleged "performance harassment" for conduct that occurred after April 7, 2018, and an alleged seven-day suspension in May 2018 (Count 1); (2) a retaliation claim related to both alleged "performance harassment" for conduct that occurred after April 7, 2018, and an alleged seven-day suspension in May 2018 (Count 2); and (3) a retaliatory hostile work environment claim related to both an alleged December 2017 letter of warning, and alleged retaliatory harassment about performance issues thereafter.  Doc. 51 at 13–14.

The court's prior orders also addressed the scope of Fortner's retaliatory hostile work environment claim.  Doc. 51 at 10–13; *see* Doc. 34 at 7–8 (similar); *infra* Part III.

## 2.    This summary judgment motion

After the close of discovery,[3] Defendant filed this summary judgment motion. Doc. 70.   The motion has been fully briefed (Doc. 73; Doc. 81), and the court held a motion hearing on June 28, 2022 (*see* Minute Entry, Entered: 06/28/2022).

### B.    Legal background

Title VII includes different governing provisions for private and federal employers. *Tonkyro v. Secretary, Dep't of Veterans Affairs*, 995 F.3d 828, 833 (11th Cir. 2021).   For federal employers, including the USPS, Title VII requires that "all personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-16(a).

Under 42 U.S.C. § 2000e-16 and 5 U.S.C. § 2302(a)(2)(A), personnel actions in the federal employment context "include most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews."   *Babb v. Wilkie*, 140 S. Ct. 1168, 1172–73 (2020) (citing 5 U.S.C. § 2302(a)(2)(A)); *see* 5 U.S.C. § 2302(a)(2)(A) ("personnel action" includes "any other significant change in duties, responsibilities, or working conditions").

Caselaw has extended 42 U.S.C. § 2000e-16 to reach not just discrimination claims, but claims for retaliation and a retaliatory hostile work environment. *See,*

---

[3] This case was reassigned to the undersigned on August 31, 2021.   Doc. 57.

*e.g.*, *Babb v. Secretary, Dep't of Veterans Affairs*, 992 F.3d 1193, 1203 (11th Cir. 2021) ("*Babb II*") ("[R]etaliation for complaining about prohibited forms of discrimination is itself 'discrimination' within the meaning of § 2000e-16(a)." (citing *Porter v. Adams*, 639 F.2d 273, 278 (5th Cir. 1981)).

### C.   Factual background

#### 1.   Fortner's employment history at the USPS, and undisputed attendance issues

Fortner was hired by the USPS on or around August 25, 2001.   Doc. 70 at 8; Doc. 73 at 1, 10.   In 2014, Fortner was promoted to a Level 7 Maintenance Mechanic.   Doc. 70 at 8; Doc. 73 at 1.   At the time that Defendant filed this summary judgment motion in April 2022, Fortner still held that same position. Doc. 70 at 8; Doc. 73 at 1, 10.

From 2017 through May 2020, Fortner was supervised by Brandon Jordan, an African American male.   Doc. 70 at 8; Doc. 73 at 1, 10.

It is undisputed that Fortner had attendance issues (e.g., unexcused absences, tardy arrivals) during the relevant time period, and that the USPS attempted to accommodate her work schedule in order to address those attendance issues.   Doc. 70 at 9; Doc. 73 at 3; Doc. 73-3 at 31–33.

#### 2.   December 2017:   Letter of warning

On November 29, 2017, Fortner was issued a letter of warning for unsatisfactory attendance; Jordan signed that letter on December 5, 2017.   Doc. 69-

16 at 8–9.   The letter of warning stated that, "[e]ven though we tried to accommodate your schedule twice, you still have failed to be regular in attendance and maintain your assigned schedule."   Doc. 69-16 at 9; *see* Doc. 70 at 16; Doc. 73 at 11; Doc. 73-3 at 31; Doc. 81 at 3.

Fortner alleges that, in December 2017, she filed a union grievance related to the letter of warning, but that the grievance/complaint eventually was settled and withdrawn.   Doc. 70 at 16; Doc. 73 at 8–9, 12.[4]   The record evidence shows that the grievance was settled on January 10, 2018, after the parties reached a compromise and agreed that the letter of warning would be rescinded.   Doc. 70 at 16; Doc. 69-16 at 1; Doc. 69-18 at 1; Doc. 73 at 12.

### 3.    Before and after April 7, 2018:   Comparator attendance issues and "clicks"

Fortner asserts that from October 1, 2017, to December 31, 2017, seven of her male coworkers were late reporting to work on multiple occasions.   Doc. 73 at 10–11.   According to Fortner, those male coworkers "were allowed to work over (extra-clicks) and/or adjust their lunch break time for the same number of minutes as the late clock-in[s]."   Doc. 73 at 11.   Each male coworker "elected to make up some if not all of their late clock-ins."   Doc. 73 at 11.

---

[4] As discussed below (*see infra* Part II.B), Fortner refers to her December 2017 complaint as both a union grievance and an EEO complaint, but does not dispute that the complaint was settled through a compromise agreement.   Doc. 70 at 16; Doc. 73 at 8–9, 12.

In that same timeframe, Fortner herself "had 33 late clock-ins of which she made up 7." Doc. 73 at 11.

Fortner also argues that, in 2018, "Maintenance Mechanic Raymond Mack (white male) . . . was late 44 times," and "received no discipline from Jordan." Doc. 73 at 14, 24–25 (citing Doc. 73-3 at 30).

### 4. Before and after April 7, 2018: Fortner's attendance issues and related meetings with Jordan

Fortner alleges that from February 2018 through April 2018, Jordan (her supervisor) held several "performance meetings" or "attendance reviews" with her. Doc. 73 at 12–13. As noted above, it is undisputed—and Fortner admitted in her deposition—that she was late to work and had unscheduled absences while Jordan was her supervisor. Doc. 69-1 at 10; Doc. 70 at 10; Doc. 73 at 4. It also is undisputed that Fortner and Jordan met several times in April and May 2018 to discuss her attendance issues, and possibly other matters. Doc. 70 at 10; Doc. 73 at 13.[5]

---

[5] At her deposition, Fortner could not recall the dates that she met with Jordan to discuss her attendance issues. Doc. 70 at 10; Doc. 69-1 at 10. At the June 28, 2022 motion hearing, Defendant asserted that Fortner was absent from work on at least one of the days that Fortner asserted Jordan held a performance meeting with her. At the motion hearing, the parties also disputed whether certain meetings between Fortner and Jordan may have been held only for Fortner to sign a form confirming prior work absences, for performance coaching purposes, or in connection with Jordan's investigation into Fortner's April 19, 2018 verbal altercation with Jared Black (discussed below in text). Even construing the evidence in Fortner's favor, these fact disputes are not material.

In addition, it is undisputed that, during at least one meeting between Jordan and Fortner, Jordan offered Fortner "assistance in modifying her schedule so that 'she could actually make it to work on time.'"   Doc. 70 at 9; Doc. 73 at 3.

### 5.      2017–18:   Fortner's work assignment to "the tunnel"

In her response to Defendant's summary judgment motion, Fortner also argued that she received "undesirable assignments that male employees did not have to undertake," such as working in "the tunnel."   Doc. 73 at 13.   According to Fortner's opposition brief, she was assigned to "the tunnel" from "late December 2017 to early 2018," where she was "tasked with removing locks from vintage post office box units."   Doc. 73 at 13.

### 6.      April 19, 2018:   Fortner's verbal altercation with Jared Black, and the recommended seven-day suspension, which was withdrawn

On April 19, 2018, Fortner was performing maintenance on a machine, as requested by Jordan.   Doc. 70 at 13; Doc. 73 at 14.   While Fortner was performing that maintenance, she was approached by Jared Black—another USPS employee, who is a white male.   Doc. 70 at 13; Doc. 73 at 14.   The parties dispute whether Black was instructing Fortner about how to properly perform the maintenance, but it is undisputed that Black and Fortner were involved in a verbal altercation.   Doc. 70 at 13–14; Doc. 73 at 14–15.   It also is undisputed that Fortner used profanity during the altercation.   Doc. 70 at 14; Doc. 73 at 15.

Jordan conducted an investigation of the incident, found that Fortner was at fault, and recommended that Fortner receive a seven-day suspension.   Doc. 70 at 13; Doc. 73 at 14.   Jordan did not recommend that Black receive any discipline. Doc. 73 at 14; Doc. 81 at 6.

On May 18, 2018, the USPS issued Fortner a "Notice Of 7 Day Suspension" (dated May 17, 2018).   Doc. 69-12 at 1–2; *see* Doc. 73 at 15; Doc. 81 at 6.   That notice stated as follows:   "You are hereby notified that you will be suspended for a period of 7 calendar days beginning June 02, 2018.   This suspension will be held in abeyance pending the final disposition of a grievance, if filed timely."   Doc. 69-3 at 27; Doc. 69-12 at 1.

But, on that same day (May 18, 2018, i.e., before that noticed suspension would have begun on June 2, 2018), Fortner began a 16-month leave of absence. Doc. 70 at 16–17; Doc. 37 at 9; Doc. 69-4 at 33.

Then, Fortner filed a grievance related to the notice of suspension.   *See* Doc. 69-1 at 15; Doc. 70 at 4; Doc. 73 at 7.   And, on June 20, 2018 (that is, long before Fortner returned to work after her leave of absence), the recommended seven-day suspension was withdrawn and reduced to an "official discussion."   Doc. 70 at 14; Doc. 73 at 7; Doc. 69-4 at 34.

In January 2020, Fortner returned to work from her leave of absence.   Doc.

70 at 17; Doc. 73 at 9.[6]   So, as discussed in the June 28 motion hearing, Fortner did

not actually serve any part of the seven-day suspension and received no loss of pay,

because the suspension was reduced to an "official discussion" before the suspension

would have begun, while Fortner was on leave, and before she returned to work.

### 7.   2017–18:   Fortner's attendance issues and "official discussions"

According to Fortner, she was subjected to "official discussions" on account

of her attendance issues.   Doc. 73 at 23, 27–28.   An "official discussion[]" is "not

placed in an employee's personnel file."   Doc. 73-4 at 3; *see* Doc. 73 at 10–11.   It

is "considered a lesser form of discipline."   Doc. 73-4 at 3; *see* Doc. 73 at 10–11.

On the "discipline continuum" for the USPS, an "official discussion" is the

"first tool a manager may use to correct negative employee behaviors and is usually

the precursor to written discipline such as a Letter of Warning."   Doc. 73 at 12

(citing Doc. 69-7 at 15–16).

It is undisputed that Fortner received at least three "official discussions"

before the December 2017 letter of warning (*see supra*).   Doc. 70 at 18; Doc. 73 at

9.   It   also   is   undisputed   that   the   seven-day   suspension   that   was

---

[6] Defendant argued, and Fortner did not dispute, that Fortner took a 16-month leave of absence from her position with the USPS.   Doc. 70 at 16–17; Doc. 73 at 9. Plaintiff testified to the same in her deposition.   Doc. 69-1 at 22.   However, if Plaintiff was on leave from May 2018 until January 2020, her leave appears to have been longer than 16 months.   Regardless, the exact length of her leave of absence is not a material fact.

noticed/recommended for Fortner in May 2018 was withdrawn, and reduced to an "official discussion" in June 2018 (*see supra*).   Doc. 70 at 14; Doc. 73 at 7.

Otherwise (as discussed in the June 28 motion hearing), the parties dispute whether Fortner was subjected to any "official discussions" between December 2017 and May 2018—e.g., whether some or all of Fortner's performance meetings or attendance reviews with Jordan should be characterized as "official discussions." But, even construing the evidence in Fortner's favor, these fact disputes are not material.

### 8.    May 22, 2018:    Fortner's EEO counseling form and complaint

As noted above (*see supra* Background A.1), on May 22, 2018, Fortner submitted the EEO information for counseling form that preceded this lawsuit. Doc. 69-4 at 11.   And, on August 27, 2018, Fortner submitted a formal EEO complaint as a prerequisite to this lawsuit.   Doc. 69-4 at 1.

### LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A material fact is one that might affect the outcome of the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond mere allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

Finally, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord, e.g.*, *Edwards v. National Vision, Inc.*, 568 F. App'x 854, 859 (11th Cir. 2014); *Brown v. Alabama DOT*, 597 F.3d 1160, 1179 (11th Cir. 2010).

## DISCUSSION

There is no genuine issue as to any material fact on Plaintiff Fortner's claims for discrimination, retaliation, and a retaliatory hostile work environment. The court has conducted an exhaustive review of the record evidence to determine whether there is a triable issue. While Rule 56 may not have required such an exhaustive review,[7] the court felt duty-bound to do so for the parties, particularly Ms. Fortner. The court's reasoning proceeds as follows.

As noted above and discussed below, the *Babb* case significantly changed the standard for a federal employee plaintiff to prove causation on claims for discrimination and retaliation (and a retaliatory hostile work environment). *See* 140 S. Ct. 1168. But, even under *Babb*, a plaintiff still must show that she was subjected to some actionable "personnel action" or "adverse employment action" (or a retaliatory hostile work environment). *See, e.g.*, 42 U.S.C. § 2000e-16(a); 5 U.S.C. § 2302(a)(2)(A).

Consequently, as a threshold matter, the court views and analyzes the record evidence and Fortner's claims through the lens of the USPS's alleged employment actions that Fortner has identified—practically speaking, the USPS's alleged

---

[7] *Cf. Chavez v. Secretary, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (stating that appellate judges are not required to "hunt[] for truffles," and that trial court judges "are not required to ferret out delectable facts" (citation and quotation marks omitted)).

15

wrongful conduct.   In particular, Fortner has asserted that the USPS took the following alleged employment actions against her:   (1) the letter of warning in December 2017; (2) the alleged differential treatment of similarly situated white and/or male employees, who were allowed to make up work time they had missed on account of tardiness and/or absences ("clicks"), in 2017–18; (3) the alleged performance meetings or attendance reviews with her supervisor, Brandon Jordan, in 2017–18; (4) the allegedly "undesirable" work assignment to "the tunnel" in 2017–18; (5) the notice of a recommended seven-day suspension in May 2018, which followed from Fortner's verbal altercation with Jared Black in April 2018, but which was withdrawn, and which Fortner never served on account of her grievance and leave of absence; and (6) the alleged "official discussions" related to her attendance issues in 2017–18.   *See supra* Factual Background.

For context, Fortner alleged in the operative complaint that, "[f]rom October 2, 2017 to May 18, 2018, [she] was subjected to discriminatory terms and conditions of employment in that she was continuously disciplined for alleged rules infractions for which similarly situated white and/or male employees suffered no punishment." Doc. 37 at 3.   "Specifically, [Fortner's] attendance was subjected to increased scrutiny while the attendance of white and/or male employees was not monitored," and Fortner "was made to meet with her manager on a weekly basis to discuss 'phantom' attendance issues," but "[w]hite and/or male employees were not

subjected to this intimidating term and condition of employment."   Doc. 37 at 6.

Fortner alleged that "[she] was issued a letter of warning" in December 2017 "after

initiating [a] complaint."   Doc. 37 at 3.   Fortner also alleged that she "received a

seven-day suspension dated May 18, 2018 for unacceptable conduct," and that "Mr.

[Jared] Black received no discipline for his role in the altercation" discussed above

(and below).   Doc. 37 at 4.

     In her opposition to Defendant's summary judgment motion, Fortner argued

that "she was:   (1) subjected to the discriminatory application of discipline

(suspension for altercation started by Timothy Jared Black, Letter of Warning and

official discussions related to attendance); (2) given an undesirable re-assignment to

the 'tunnel' sub-basement to perform menial tasks; (3) as a result of being assigned

to the 'tunnel' she was denied on-the-job training and the attendant increase in pay;

and, (4) as a result of being assigned to the 'tunnel' missed the hands on experience

of working in a higher grade which impacted her ability to promote to a higher

position."   Doc. 73 at 23.   Fortner argued that "the official discussions and weekly

attendance meetings [we]re also prohibited personnel actions."   Doc. 73 at 23.

Fortner also argued that she "testified that she had first hand knowledge of white

and/or male employees being allowed to work extra clicks (make up their time),"

and that those white and/or male employees "were allowed to make up their late

clock ins."   Doc. 73 at 5, 24.

In addition, on September 11, 2018, the USPS's EEO office accepted the following claims for investigation as race and gender discrimination and retaliation: On October 2, 2017, November 16, 2017, and on November 25, 2017, Fortner was subjected to "official discussions"; on October 3, 2017, Fortner's supervisor confronted her about leaving her work area; on December 12, 2017, Fortner was issued a letter of warning; in February through April 2018, Fortner was called into Brandon Jordan's office on a weekly basis; on April 26, 2018, and on May 15, 2018, Fortner was subjected to investigative interviews; and, on May 18, 2018, Fortner was issued notice of a seven-day suspension dated May 17, 2018, for unacceptable conduct.   Doc. 70 at 18 (citing Doc. 69-20 at 1–2); Doc. 73 at 9.

Big-picture, this case is about alleged differential "discipline"—i.e., that the USPS allegedly disciplined Fortner more harshly than similarly situated white and/or male employees.   But, importantly, the only alleged "discipline" is the list of alleged employment actions discussed above.   Again, for sake of clarity (and based on the court's exhaustive review of the record and briefing), Fortner has identified the following as the USPS's alleged employment actions (i.e., the USPS's alleged "discipline" against her):   the letter of warning (December 2017); the alleged differential treatment of similarly situated white and/or male employees, who were allowed to make up work time or "clicks" (2017–18); the alleged performance meetings or attendance reviews with Jordan (2017–18); the allegedly "undesirable"

18

work assignment to "the tunnel" (2017–18); the notice of a recommended seven-day suspension, which Fortner never served (May 2018); and the alleged "official discussions" related to attendance (2017–18).

But, whether viewed separately or collectively (and construing all evidence and reasonable inferences in Fortner's favor), the record evidence regarding these alleged employment actions is insufficient to create a triable jury issue on the required "personnel action" or "adverse employment action" element of Fortner's claims.

## I.     There is no genuine issue as to any material fact on Fortner's claim for discrimination because Fortner cannot create a triable jury issue on the required "personnel action" element of her claim.

There is no genuine issue as to any material fact on Fortner's discrimination claim because she cannot create a triable jury issue on the required "personnel action" element of her claim.  *See Celotex*, 477 U.S. at 322–23 (a "failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial").

### A.     The *Babb* causation standard for a discrimination claim against a federal employer, and the essential element of a "personnel action."

Until recently, to prevail on a discrimination claim against a federal employer under 42 U.S.C. § 2000e-16(a), a plaintiff had to show that her protected status "was the but-for cause of the adverse employment action" at issue.  *Durr v. Secretary, Dep't of Veterans Affairs*, 843 F. App'x 246, 247 (11th Cir. 2021).

But the United States Supreme Court's recent ruling in *Babb v. Wilkie* changed the law for discrimination claims filed by federal employees. 140 S. Ct. 1168. The U.S. Supreme Court held, in the context of a federal employee's discrimination claim under the Age Discrimination in Employment Act (ADEA), that "age need not be a but-for cause of an employment decision" for a plaintiff to prove discrimination. *Id.* at 1172. Instead, age must be "the but-for cause of *differential treatment*," not the but-for cause of an ultimate employment decision. *Id.* at 1174 (emphasis in original). As a result, at least with respect to *liability*, a federal employee alleging discrimination under the ADEA need only show that age discrimination played "any part" in the way that the federal employer made a personnel decision. *Id.*

After announcing that new standard, the Supreme Court remanded the *Babb* case to the Eleventh Circuit for further proceedings. *Id.* at 1178. On remand, the Eleventh Circuit held that the statutory language from the ADEA, which the Supreme Court had analyzed in *Babb*, is "materially identical" to the Title VII language in 42 U.S.C. § 2000e-16(a). *Babb II*, 992 at 1198.[8] The Eleventh Circuit held that the Supreme Court's *Babb* rule applies not only to a federal employee's

---

[8] *See* 29 U.S.C. § 633a (requiring that all personnel actions for federal employees be "free from any discrimination based on age" under the ADEA); 42 U.S.C. § 2000e-16(a) (requiring that all personnel actions for federal employees be "free from any discrimination" based on race, color, religion, sex, or national origin under Title VII).

claims under the ADEA, but also to a federal employee's discrimination (and retaliation) claims under Title VII.   *Id.*

Consequently, under 42 U.S.C. § 2000e-16(a), a federal employer must make a personnel decision "in 'a way that is not tainted by differential treatment based on' a protected characteristic."   *Id.* at 1199–1200 (quoting *Babb*, 140 S. Ct. at 1174). A personnel decision is tainted by discrimination if a protected characteristic plays "any part" in the way that the federal employer made that decision.   *Id.* at 1204 (quoting *Babb*, 140 S. Ct. at 1174).   Thus, a federal employer is liable for discrimination under Title VII if a protected characteristic was "the but-for cause of *differential treatment*," regardless whether the protected characteristic was the but-for cause of the ultimate employment decision.   *Id.* (quoting *Babb*, 140 S. Ct. at 1174).   "[E]ven when there are non-pretextual reasons for an adverse employment decision," the "presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations."   *Id.* at 1204.

Importantly (as noted above), *Babb* changed the causation standard for determining whether a federal employer's alleged conduct was discriminatory; but, it does not appear that *Babb* changed the law that an actionable "personnel action" still is an essential element of a claim for discrimination (or retaliation) against a federal employer.[9]   *See* 42 U.S.C. § 2000e-16(a); 5 U.S.C. § 2302(a)(2)(A).

---

[9] Fortner has not argued that *Babb* changed the standard for a "personnel action,"

So, even after *Babb*, a federal employee plaintiff alleging a discrimination claim "makes out a prima facie case of discrimination by showing," among other things, that "his employer subjected him to an adverse employment action." *Malone v. United States Att'y Gen.*, 858 F. App'x 296, 300 (11th Cir. 2021) (post-*Babb II* federal employee plaintiff) (citing *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).

Moreover, in addressing the "personnel action" element of a discrimination (or retaliation) claim against a federal employer, the Eleventh Circuit routinely has relied on cases addressing the analogous "adverse employment action" element of a claim against a private employer. *See, e.g.*, *Malone*, 858 F. App'x at 300 (post-*Babb*) (citing *Lewis*, 934 F.3d at 1185); *supra*.   Indeed, in an unpublished opinion, the Eleventh Circuit reasoned that the provisions of Title VII governing federal employers and private employers are "legally equivalent," and that "the coverage is the same under § 2000e-16 and § 2000e-2." *Putman v. Secretary*, 510 F. App'x 827, 829 (11th Cir. 2013).   Again, *Babb* changed the causation standard for claims against federal employers, but there is no reason to think that *Babb* changed anything about the interpretation and application of the other essential elements of a discrimination (or retaliation) claim against a federal employer.   Thus, in addressing the "personnel action" element of Fortner's claim, this court too will rely on cases

_____

and the court has found no caselaw suggesting any such change.

addressing the analogous "adverse employment action" element of a claim against a private employer.

In this regard, "[i]t has long been settled that Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality," and that "[t]rivial slights are not actionable." *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

"[S]ome events are substantial enough standing alone to be actionable. These have sometimes been referred to as 'tangible' or 'adverse' employment actions. The terms are interchangeable, at least as applied to this kind of discrimination claim." *Id.* (collecting cases).[10]

"Tangible employment actions consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Id.* (citation omitted).

---

[10] While Fortner has alleged a *retaliatory* hostile work environment claim (*see infra* Part III), she has not alleged a discriminatory "hostile-environment claim." *See, e.g.*, *Monaghan*, 955 F.3d 855, 861 ("[M]istreatment based on race or other prohibited characteristics, including subjection to adverse conditions, is actionable even if the mistreatment does not rise to the level of a tangible employment action, but only if the mistreatment is 'sufficiently severe or pervasive' that it can be said to alter the terms, conditions, or privileges of employment. A claim based on this kind of mistreatment is often referred to as a hostile-environment claim." (citation omitted)).

In addition, under 5 U.S.C. § 2302(a)(2)(A), a "personnel action" includes "any other significant change in duties, responsibilities, or working conditions."   *Id.*

On the other hand, actions such as "disciplinary memoranda are not sufficiently adverse if they did not cause the plaintiff 'any present or foreseeable future economic injury.'"   *Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020) (citing *Davis v. Town of Lake Park*, 245 F.3d 1232, 1240 (11th Cir. 2001)).   "Similarly, an internal investigation—like any alleged adverse employment action—is not sufficient to state a discrimination claim if it did not cause . . . negative job consequences."   *Id.*

**B.    The evidence for each of the USPS's alleged employment actions is insufficient for Fortner to create a triable issue of fact for a jury on the "personnel action" element of her discrimination claim.**

The evidence for each of the USPS's alleged employment actions is insufficient for Fortner to create a triable fact issue for a jury on the required "personnel action" element of her discrimination claim.   It is undisputed that, during the relevant time period, Fortner was not terminated or demoted, and the USPS did not cut her pay.   In fact, Fortner has worked for the USPS for more than 20 years—from 2001 until at least May 2022.   Doc. 70 at 8; Doc. 73 at 1, 10.   And, Fortner worked in the same position (a Level 7 Maintenance Mechanic) from 2014 until at least April 2022.   *See* Doc. 70 at 8; Doc. 73 at 1.

As explained above, Fortner has identified the following as the USPS's

alleged "personnel actions" in this case:  (1) the letter of warning in December 2017; (2) the alleged differential treatment of similarly situated white and/or male employees, who were allowed to make up work time they had missed on account of tardiness and/or absences ("clicks"), in 2017–18; (3) the alleged performance meetings or attendance reviews with her supervisor, Brandon Jordan, in 2017–18; (4) the allegedly "undesirable" work assignment to "the tunnel" in 2017–18; (5) the notice of a recommended seven-day suspension, which followed from Fortner's verbal altercation with Jared Black in April 2018, but which was withdrawn, and which Fortner never served on account of her grievance and leave of absence; and (6) the alleged "official discussions" related to her attendance issues in 2017–18. *See supra* Factual Background.[11]

### 1.    The letter of warning (December 2017).

The December 2017 letter of warning cannot constitute an actionable "personnel action" because the court already has dismissed with prejudice as unexhausted and untimely Fortner's discrimination claim based on the USPS's

---

[11] Fortner also argues that, under 5 U.S.C. § 2302(2)(A), the "following prohibited personnel actions are applicable here:  (iii) an action under chapter 75 of this title or other disciplinary or corrective action; (iv) a detail, transfer, or reassignment; (ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph; and, (xii) any other significant change in duties, responsibilities, or working conditions."  Doc. 73 at 22 (citing 5 U.S.C. § 2302(2)(A)).

alleged employment actions before April 7, 2018.  *See* Doc. 34; Doc. 51 at 8–9. Consequently, Fortner cannot create a triable issue of fact for a jury on the "personnel action" element of her discrimination claim based on the December 2017 letter of warning.

### 2.    Comparator attendance issues and "clicks" (2017–18).

In opposition to Defendant's summary judgment motion, Fortner argued that similarly situated males "were allowed to work over (extra-clicks) and/or adjust their lunch break time," but that she was not afforded the same opportunity for "extra clicks."   Doc. 73 at 11.   According to Fortner, this differential treatment occurred between October 1, 2017, and December 31, 2017.   Doc. 73 at 10.

As evidence supporting this argument, Fortner identified an investigative report that an EEO Complaints Investigator completed in August 2018.   Doc. 73-3. Fortner attached that investigative report as an exhibit to her response to Defendant's summary judgment motion.   Doc. 73-3.   The investigative report included a chart summarizing "Employee Everything Reports" for Fortner and certain male employees.   Doc. 73-3 at 31–32.   That summary chart included a column labeled "# Extended tour hours and/or lunch break adjustments."   Doc. 73-3 at 31.   It appears that Fortner relied on this chart for her argument that she only was permitted to work extra clicks on 7 occasions, while the male employees were allowed

additional opportunities to work extra clicks after arriving late.[12]

But, as stated above (and as the summary chart makes clear), this evidence is limited to the timeframe between October 1, 2017, and December 31, 2017. Doc. 73-3 at 31. Any differential treatment in that timeframe cannot constitute an actionable "personnel action" because the court already has dismissed with prejudice as unexhausted and untimely Fortner's discrimination claim based on the USPS's alleged employment actions before April 7, 2018. *See* Doc. 34; Doc. 51 at 8–9.

In her opposition brief, Fortner also argued that "Maintenance Mechanic Raymond Mack (white male) . . .was late 44 times in 2018" and "received no discipline from Jordan." Doc. 73 at 14, 24–25 (citing Doc. 73-3 at 30). As evidence supporting this argument, Fortner identified another summary chart in the EEO investigative report. Doc. 73-3 at 30. In a column labeled "2018 Unscheduled Hours/Lates," that summary chart showed that Fortner had "205.98

---

[12] At the June 28, 2022 motion hearing, Defendant argued that supervisors—such as Jordan—serve on a rotating basis, and consequently that it is impossible to know which supervisor approved Fortner's extra clicks or the male employees' extra clicks. At the hearing, Defendant also argued that supervisors of maintenance workers (like Jordan) are more likely to serve on a rotating basis than other supervisors. *See also* Doc. 70 at 8 ("Supervisors in maintenance operations served on a rotational basis and many USPS employees in maintenance operations reported to them."); Doc. 73 at 1. Defendant argued that because of the rotating supervisory roles, the "Employee Everything Reports" chart was not reliable evidence that Jordan was approving all overtime and favoring male employees over Fortner. The court need not reach this issue, and construes the evidence in Fortner's favor as indicating that Jordan approved all overtime/clicks reflected in the chart.

Non-FMLA Unscheduled Leave hours, including 3 Lates for 2018 through May 18, 2018," and that Mack had just 3.01 "Non-FMLA Unscheduled Leave hours," including 44 "Lates."   Doc. 73-3 at 30.

Again, it appears that most of this evidence relates to the timeframe before April 7, 2018, and consequently is not actionable on Fortner's discrimination claim. *See* Doc. 34; Doc. 51 at 8–9.   Even for any unscheduled leave hours that might post-date April 7, 2018 (which would be speculative), it appears that Fortner generally had *more* unscheduled leave hours, even if Mack had more lates.   So, it is not clear that Fortner and Mack are similarly situated for Title VII purposes.   *See Lewis*, 918 F.3d at 1224 ("[A] plaintiff must show that she and her comparators are 'similarly situated in all material respects.'" (citation omitted)).

More importantly, for 2018 (i.e., whether before or after April 7, 2018), Fortner does not argue—and has identified no evidence—that Mack was afforded an opportunity to make up work time or "clicks," where Fortner was not.   And, without any supporting evidence, the suggestion in the June 28 motion hearing that the USPS's supposed practice of affording male employees additional "clicks" would have continued from October–December 2017 until after April 7, 2018, is too speculative to create a triable fact issue for a jury.   *See Marshall v. Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986) ("All reasonable inferences arising from the evidence must be resolved in favor of the non-movant, but inferences based upon

speculation are not reasonable." (citation omitted)); *Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment."); *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002) ("[A]n affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to . . . create[] a genuine issue of fact about the existence of that certain fact.").

Instead, Fortner argues only that Mack "received no discipline from Jordan." Doc. 73 at 14, 24–25.   But, in this regard, the problem again is that Fortner has not identified any evidence that she "received" any "discipline from Jordan."   *See id.* Thus, with respect to Mack's 44 lates in 2018, there is no actionable "personnel action."   Consequently, Fortner cannot create a triable issue of fact for a jury on the "personnel action" element of her discrimination claim based on comparator attendance issues and alleged differential treatment in "clicks" and "discipline."

### 3.    Performance meetings or attendance reviews with Jordan (2017–18).

As discussed above, Fortner alleged in her complaint that the USPS—that is, Brandon Jordan, her supervisor—improperly required her to engage in performance meetings regarding her attendance issues.   Fortner alleged that from February 2018 until May 2018 she was "called into Mr. Jordan's office on a weekly basis and verbally harassed about 'phantom' attendance issues."   Doc. 37 at 3–4; *see also*

Doc. 73 at 12 (Fortner was called into Jordan's office to "discuss non-existent attendance issues").

Fortner asserts that these meetings occurred on the following dates:   February 13 and 18, 2018; March 13 and 20, 2018; April 26, 2018; and May 3, 9, 15, and 18, 2018.   Doc. 73 at 13.

Again, any meeting before April 7, 2018, cannot constitute an actionable "personnel action" because the court already has dismissed with prejudice as unexhausted and untimely Fortner's discrimination claim based on the USPS's alleged employment actions in that timeframe.   *See* Doc. 34; Doc. 51 at 8–9.

With respect to any meeting after April 7, 2018, Fortner has presented no evidence from which a reasonable jury could conclude that Fortner was subjected to an adverse employment action.   As a preliminary matter, while Fortner has argued that these meetings related to "phantom" or "non-existent" attendance issues (Doc. 37 at 3–4; Doc. 73 at 12), Fortner does not dispute in her opposition brief that she was late to work and had unscheduled absences while Jordan was her supervisor; indeed, Fortner admitted as much in her deposition, and the record is undisputed in that regard.   *See, e.g.*, Doc. 69-1 at 10; Doc. 70 at 10; Doc. 73 at 4.   Generally speaking, meetings with a supervisor regarding attendance appear to have been appropriate, particularly given that the USPS already had accommodated Fortner's work schedule in an attempt to remedy these attendance issues.   *See* Doc. 70 at 9;

Doc. 73 at 3; Doc. 73-3 at 31–33.

More importantly, there is no record evidence that any performance meeting or attendance review with Jordan created a "serious and material change in [the] terms, conditions, or privileges of [Fortner's] employment." *Crawford v. Carroll*, 529 F.3d 961, 974 n.14 (11th Cir. 2008) (quotation marks omitted).   Without more, a condition of employment alone—e.g., a required meeting with a supervisor—is "not sufficient to state a discrimination claim if it did not cause" the plaintiff "negative job consequences."   *Henderson*, 826 F. App'x at 741.

Furthermore, as noted above (and as discussed in the June 28 motion hearing), the parties disagree about how many meetings Fortner had with Jordan after April 7, 2018, and about whether the meetings were limited to attendance issues—or, for example, included investigation into the April 2018 verbal altercation with Jared Black (*see infra* Part I.B.5).   Regardless, even construing the evidence in Fortner's favor, these disputed facts are not material.   Because there is no evidence that any meeting caused Fortner any negative job consequence, none of these meetings can constitute an actionable "personnel action."   *See Henderson*, 826 F. App'x at 741; *Coles v. Post Master Gen. U.S. Postal Servs.*, 711 F. App'x 890, 895 (11th Cir. 2017) (concluding that an incident was not an actionable personnel action, even though it "may have caused [the plaintiff] personal distress").

### 4. The allegedly "undesirable" work assignment to "the tunnel" (2017–18).

On the record evidence (and for several reasons), the allegedly "undesirable" work assignment to "the tunnel" in 2017–18 does not constitute an actionable "personnel action."[13]

*First*, there is no record evidence that Fortner worked in the tunnel at any time after April 7, 2018, and Fortner has not argued that she worked in the tunnel at any time after April 7, 2018.   Again (as already explained), the court has dismissed with prejudice as unexhausted and untimely Fortner's discrimination claim based on the USPS's alleged employment actions before April 7, 2018.   *See* Doc. 34; Doc. 51 at 8–9.

In her May 2, 2022 declaration (Doc. 73-4), Fortner averred that "[she] was required to work in the tunnel and this assignment lasted into *the first few months of*

---

[13] As a preliminary matter, Defendant argues that Fortner cannot raise any claim based on her work assignment to the tunnel:   "Plaintiff did not raise her 'tunnels' assignment claims during contact with an EEO counselor or in her EEO Complaint, and as such these claims of a tunnel assignment or consequences she claims flowed from it (such as training, etc.) were never investigated in the underlying administrative process and were not administratively exhausted.   Additionally, Plaintiff did not even raise these issues in either judicial complaint (Docs. 1 & 37), or any time prior to her deposition on January 11, 2022.   Plaintiff seeks to essentially amend her complaint, without a proper motion, in her opposition to summary judgment.   Plaintiff should not be permitted to do so.   Regardless, any such amendment would be futile as Plaintiff failed to administratively exhaust her claims regarding her assignment in the 'tunnels,' and they should be dismissed." Doc. 81 at 10.   The court need not reach these issues, because there is no triable issue of fact for a jury on the tunnel allegations anyway.

*2018*."   Doc. 73-4 at 4 (emphasis added).   The court must draw all reasonable inferences in Fortner's favor (*Centurion Air Cargo*, 420 F.3d at 1149), and notes that in her deposition Fortner testified that she worked in the tunnel "for the – a great deal of 2017 through 2018," and that "[i]t was for several months starting around the end – the last half of 2017 up until about the beginning half of 2018."   Doc. 69-1 at 19.   Particularly given that Fortner knew about the court's prior order limiting her discrimination claim to alleged conduct after April 7, 2018 (and notwithstanding Fortner's inconsistent testimony), the only reasonable inference from the record evidence and briefing is that Fortner did not work in the tunnel at any time after April 7, 2018.

*Second*, even assuming that Fortner did work in the tunnel after April 7, 2018, that work assignment still would not be an actionable "personnel action."   As explained above, "[t]rivial slights are not actionable."   *Monaghan*, 955 F.3d at 860. There is no evidence that Fortner's work in the tunnel was a "significant change in [her] duties, responsibilities, or working conditions."   5 U.S.C. § 2302(a)(2)(A). Fortner still was working as a Level 7 Maintenance Mechanic, and received no reduction in pay.   Doc. 70 at 8, 23; Doc. 73 at 1.

Tellingly, there is scant record evidence about the so-called "tunnel."   In her May 2022 declaration, Fortner averred that the tunnel "is a basement two floors down from the regular work area where there are no restrooms," and that, "[i]n the

'tunnel,' [she] was tasked with removing locks from vintage post office box units."
Doc. 73-4 at 4.   In her deposition, Fortner testified that "there[] [was] no access to
outside," and that she was not aware of any other employees who had worked that
assignment.   Doc. 69-1 at 10.

Based on that limited evidence, no reasonable jury could find that any alleged
harm from work in the tunnel "reache[d]" the necessary sufficient level of
"substantiality" to be "actionable."   *Monaghan*, 955 F.3d at 860.   Without more,
Fortner's *subjective* impression that work in the tunnel was "undesirable" is not
enough to create a jury question on the "personnel action" element of her
discrimination claim.   *See Davis*, 245 F.3d at 1239 ("[T]he employee's subjective
view of the significance and adversity of the employer's action is not controlling;
the employment action must be materially adverse as viewed by a reasonable person
in the circumstances."); *Galloway v. Georgia Tech. Auth.*, 182 F. App'x 877, 881
(11th Cir. 2006) (affirming district court's holding that an employee's "subjective
belief that he was being unfairly denied benefits [was] insufficient" to demonstrate
an adverse employment action).

*Third* (and relatedly), there is no evidence that Fortner's work in the tunnel
"affect[ed] [her] continued employment or pay."   *Monaghan*, 955 F.3d at 860.   In
her deposition, Fortner testified that, "[w]hile assigned to the 'tunnel' [she] missed
out on the on-the-job training and opportunities to work as a Level 9 which would

have been an increase in pay while working that assignment." Doc. 73 at 13 (citing Doc. 69-1 at 10).[14] Fortner testified that "[t]his hands on training would have also assisted Fortner in getting promoted to positions of higher pay." Doc. 73 at 14 (citing Doc. 69-1 at 10). Fortner also testified that "[she] missed on-the-job training because she was not present to be included in the rotation of employees selected to receive higher level training," and that "[her] absence hampered her ability to gain hands on experience." Doc. 73 at 6 (citing Doc. 69-1 at 10–11); *see* Doc. 73-4 at 4 (similar); Doc. 73 at 23 (similar).

But Fortner "offered no evidence in support of this speculative assertion." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018).[15] There is no testimony or other evidence regarding what training or experience Fortner allegedly missed, or how—in such a short, alleged amount of time—it allegedly would have led to a promotion or pay raise. Without any supporting evidence, no reasonable jury could find that, while assigned to the tunnel (for some conceivable, uncertain

---

[14] Defendant argued that Fortner "never asked for the on-the-job training that she believed she missed because of her job assignment in the tunnels." Doc. 70 at 12 (citing Doc. 69-1 at 19). But that fact is disputed. Fortner argued that "[t]here is no testimony that this was a formal training program to which one could apply." Doc. 73 at 6 (citing Doc. 69-1 at 10). Even construing the evidence in Fortner's favor, these disputed facts are not material.

[15] "'Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment.'" *Hornsby-Culpepper*, 906 F.3d at 1314 (quoting *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)) (emphasis in original).

period of time after April 7, 2018), Fortner missed on-the-job training and/or hands-on experience that (hypothetically) would have led to a promotion and/or higher pay. Again, the court must draw all reasonable inferences in Fortner's favor (*Centurion Air Cargo*, 420 F.3d at 1149), but the only reasonable inference from the record evidence and briefing is that Fortner did *not* miss any promotion or pay raise on account of having missed some unspecified training or experience.   There is only Fortner's unsupported say-so speculation on this point.   *See, e.g.*, *Chatman v. AMTRAK*, 2008 U.S. Dist. LEXIS 67485, at *16 (M.D. Fla. Sept. 5, 2008) ("Plaintiff's assumption that the training would have helped him [earn a promotion] is insufficient to make his non-selection an adverse employment action." (citation omitted)); *Osahar v. Potter*, 2006 U.S. Dist. LEXIS 113605, at *47 (S.D. Fla. March 21, 2006) ("The speculative hypothetical possibility of lost overtime is insufficient to establish that the denial of training on these specific dates was an adverse action.").[16]

---

[16] *Accord, e.g.*, *Shine v. Board of Trs.*, 2021 U.S. Dist. LEXIS 248007, at *19 (N.D. Ala. Dec. 30, 2021) (granting summary judgment on a claim for discriminatory failure to promote, and reasoning that the plaintiff's evidence of alleged discrimination was "irrelevant because [the plaintiff] never applied for a promotion"); *Sanders v. City of Montgomery*, 319 F. Supp. 2d 1296, 1315 n.16 (M.D. Ala. 2004) ("Based on the evidentiary record before the Court, the Court is not persuaded that the denial of training . . . constituted an adverse employment action in and of itself."); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1264 (M.D. Ala. 2001) (reasoning that "a denial of job training . . . , standing alone, is an intangible action").

In fact, the record evidence contradicts that speculation:   As explained above, for approximately 8 years (from 2014 until at least April 2022), Fortner worked in the same position—as a Level 7 Maintenance Mechanic.   *See* Doc. 70 at 8; Doc. 73 at 1.   Without more, it would be unreasonable for a jury to infer from the record evidence that Fortner would have been promoted or earned a pay raise had she not been assigned to the tunnel for some uncertain amount of time in 2018 (after April 7, 2018).

Consequently, Fortner cannot create a triable issue of fact for a jury on the "personnel action" element of her discrimination claim based on the allegedly "undesirable" work assignment to the tunnel.

**5.    The notice of the recommended (and withdrawn) seven-day suspension following Fortner's verbal altercation with Jared Black (April 19–June 20, 2018).**

Fortner alleged in her complaint that, "[o]n April 26, 2018, and May 15, 2018, [she] was subjected to investigative interviews presumably about the April 19, 2018 altercation" with Jared Black, and that she "received a seven-day suspension dated May 18, 2018, for unacceptable conduct."   Doc. 37 at 4.   In her response to Defendant's summary judgment motion, Fortner referred back to these allegations (Doc. 73 at 15, 23), and argued that Black "suffered no discipline" (Doc. 73 at 29). Again, the record evidence shows that Fortner was not disciplined either, and that there was no actionable "personnel action" in this regard.

Preliminarily, while Jordan interviewed Fortner as part of his investigation into her verbal altercation with Black, any such interviews standing alone cannot be an adverse employment action for purposes of a discrimination claim.   As explained above, "an internal investigation . . . is not sufficient to state a discrimination claim if it did not cause" Fortner "negative job consequences."   *Henderson*, 826 F. App'x at 741.   And there is no record evidence that those investigative interviews (or any related performance meetings or attendance reviews, *see supra* Part I.B.3) caused Fortner any "negative job consequences."   *See Henderson*, 826 F. App'x at 741.

With regard to the supposed seven-day suspension (and as explained above), the record facts are different from Fortner's allegations.   While the court previously observed that Fortner's "suspension arguably qualifies [as an adverse employment action] even if no further consequences flowed from it," that observation was not made on the summary judgment record and instead related to Defendant's second motion to dismiss.   *See* Doc. 51 at 13 n.9 (citing *Evans v. Alabama Dep't of Corr.*, 418 F. Supp. 2d 1271, 1276 (M.D. Ala. 2005)).   That observation did not account for the undisputed facts that Fortner never served any suspension, and never lost any pay because of any suspension.   *See supra* Background C.6.

Fortner is correct that Jordan did recommend a seven-day suspension for her, and that Jordan recommended no discipline for Black.   Doc. 70 at 13; Doc. 73 at 14; Doc. 81 at 6.   But the record shows that, on May 18, 2018, the USPS then issued

Fortner a "Notice Of 7 Day Suspension" (dated May 17, 2018).   Doc. 69-12 at 1–2; *see* Doc. 73 at 15; Doc. 81 at 6.   Fortner was "notified that [she] [would] be suspended for a period of 7 calendar days beginning June 02, 2018," and that the "suspension [would] be held in abeyance pending the final disposition of a grievance, if filed timely."   Doc. 69-12 at 1.

Fortner never served that seven-day suspension, and never lost any pay. Instead, on that same day (May 18, 2018), and before that noticed suspension would have begun on June 2, 2018, Fortner began a 16-month leave of absence.   Doc. 70 at 16–17; Doc. 69-4 at 33.[17]   Fortner then filed a grievance related to the notice of suspension.   *See* Doc. 69-1 at 15; Doc. 70 at 4; Doc. 73 at 7.   And, on June 20, 2018 (long before Fortner returned to work after her leave of absence), the recommended seven-day suspension was withdrawn and reduced to an "official discussion."   Doc. 69-4 at 34; Doc. 70 at 14; Doc. 73 at 7; *see infra* Part I.B.6 ("Official discussions" related to attendance).   Fortner returned to work from her leave of absence in January 2020.   Doc. 70 at 17; Doc. 73 at 9.

As a result, it is undisputed that Fortner's recommended/noticed suspension was withdrawn and reduced to an "official discussion," that she did not ever serve any suspension (for seven days or otherwise), and that she was not subjected to any

---

[17] Fortner does not allege a constructive discharge claim; indeed, she returned to work after her leave of absence.

loss of pay or other negative job consequences related to any suspension. Consequently, the recommended/noticed suspension cannot be an actionable "personnel action" on Fortner's discrimination claim. *See Filius v. Potter*, 176 F. App'x 8, 11 (11th Cir. 2006) (concluding that a suspension was not an adverse employment action because the plaintiff "never served any of the seven-day suspension," and because "it was removed from his employment record and reduced to a 'discussion'"); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001) ("[T]he decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action.").

### 6.    "Official discussions" related to attendance (2017–18).

In opposition to Defendant's summary judgment motion, Fortner argued that she was subjected to "official discussions" related to her attendance issues. Doc. 73 at 23, 27–28. But, as explained above (*see supra* Background C.7), the record evidence shows that an "official discussion" is not even a written reprimand. An "official discussion[]" is not "placed in an employee's personnel file," and is "considered a lesser form of discipline." Doc. 73-4 at 3. On the USPS "discipline continuum," an "official discussion" is the "first tool a manager may use to correct negative employee behaviors and is usually the precursor to written discipline such as a Letter of Warning." Doc. 73 at 12 (citing Doc. 69-7 at 15).

It is undisputed that Fortner received at least three "official discussions"

Case 2:19-cv-01409-NAD   Document 85   Filed 09/29/22   Page 41 of 62

before the December 2017 letter of warning (Doc. 70 at 18; Doc. 73 at 9), and that the May 2018 noticed/recommended seven-day suspension was withdrawn and reduced to an "official discussion" in June 2018 (Doc. 69-4 at 34; Doc. 70 at 14; Doc. 73 at 7).  *See supra* Parts I.B.1, I.B.5.

Otherwise, the parties dispute whether some or all of Fortner's performance meetings or attendance reviews with Jordan between December 2017 and May 2018 should be characterized as "official discussions."   But, even construing the evidence in Fortner's favor, these fact disputes are immaterial.

*First*, the undisputed "official discussions" that predated the December 2017 letter of warning cannot constitute actionable "personnel actions" because the court already has dismissed with prejudice as unexhausted and untimely Fortner's discrimination claim based on the USPS's alleged employment actions before April 7, 2018.  *See* Doc. 34; Doc. 51 at 8–9.

*Second*, neither the undisputed June 2018 "official discussion" nor any (or all) of Fortner's performance meetings or attendance reviews with Jordan after April 7, 2018—which the court construes as "official discussions" for purposes of this motion—constitute actionable "personnel actions."   Whether viewed separately or collectively, none of those "official discussions" caused Fortner any "negative job consequences."  *Henderson*, 826 F. App'x at 741.

Fortner argues that "official discussions and weekly attendance meetings are

41

also prohibited personnel actions in that while not placed in an employee's personnel file the Defendant's managers could keep notes on these interactions for use in deciding what level of discipline to issue on a later date," and that "Jordan testified that the number of official discussions an employee had played a role in whether they would receive written discipline."   Doc. 73 at 23, 29.[18]   According to Fortner, "[k]eeping score this way *could* lead to an adverse employment action significant enough to alter the terms and conditions of employment," and "she received an official discussion which *could* lead to harsher discipline, up to and including suspension without pay and termination."   Doc. 73 at 23 (emphasis added).

But (again), "[s]peculation does not create a genuine issue of fact."   *Cordoba*, 419 F.3d at 1181.   Without more, the suggestion that a predicate employment action hypothetically *could* have led to an actionable employment action does not create a triable issue for a jury.   *See, e.g.*, *Davis*, 245 F.3d at 1236 (reasoning that "criticisms of an employee's job performance—written or oral—that do not lead to tangible job

---

[18] Jordan testified that he would "refer to official discussion notes in order to assist [him] in making a decision to issue corrective action," but that "the level of corrective action, there's many factors to determine that."   Doc. 69-7 at 16.   Jordan also testified that he believed he had "official discussions" regarding attendance issues with the allegedly similarly situated male employees that Fortner has identified.   *See* Doc. 70 at 12; *see* Doc. 69-7 at 24; Docs. 69-24 to 30.   Again, an "official discussion" is not even "placed in an employee's personnel file."   Doc. 73-4 at 3.   Furthermore, the question whether Fortner was subjected to more "official discussions" than her alleged comparators is immaterial.   As discussed above in text, the "official discussions" still are not actionable instances of employee "discipline."

consequences will rarely form a permissible predicate for a Title VII suit" (collecting cases)); *Hooks v. Bank of Am.*, 183 F. App'x 833, 836 (11th Cir. 2006) (concluding that multiple employment actions including "one oral reprimand, one written reprimand, [and] the withholding of a building key" were not adverse employment actions because the plaintiff's "pay, hours, and job duties remained the same after the incidents"); *Walker v. Indian River Transp. Co.*, 2017 U.S. Dist. LEXIS 12846, at *24 (M.D. Fla. Jan. 26, 2017) (finding that a supervisor's having characterized the plaintiff as "uncooperative," "problematic," and "a complainer" was not an adverse employment action because "negative job evaluations, unless accompanied by a demotion or loss in pay, are not tangible adverse employment actions" (citing *Davis*, 245 F.3d at 1242)).

And, in this case, there is no record evidence that any "official discussion" actually did lead to an actionable "personnel action."

\*    \*    \*

Thus, on her discrimination claim, Fortner cannot create a triable issue of fact for a jury on the required "personnel action" element, and the court does not reach the *Babb* causation standard.

## II. There is no genuine issue as to any material fact on Fortner's claim for retaliation because Fortner cannot create a triable jury issue on the required "personnel action" or "adverse employment action" element of her claim.

There is no genuine issue as to any material fact on Fortner's retaliation claim

43

because she cannot create a triable jury issue on the required "personnel action" or "adverse employment action" element of her claim.   *See Celotex*, 477 U.S. at 322–23 (a "failure of proof concerning an essential element of the [plaintiff's] case necessarily renders all other facts immaterial").

### A.    The *Babb* causation standard and the essential elements for a retaliation claim against a federal employer.

A "plaintiff makes out a prima facie case of retaliation by showing that she: (1) engaged in statutorily protected activity; (2) suffered an adverse employment action; and (3) established a causal link between the protected activity and the adverse action."   *Malone*, 858 F. App'x at 303 (post-*Babb II* federal employee plaintiff, *see supra*) (citing *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009)).

As noted above, *Babb* changed the causation standard for a retaliation claim against a federal employer.   The Eleventh Circuit has instructed that retaliation claims that "are brought under Title VII's federal-sector provision are not subject to the but-for causation standard."   *Tonkyro*, 995 F.3d at 833; *see Babb II*, 992 F.3d at 1198, 1205.

However, the other essential elements remain the same, including the requirement of a "personnel action" or "adverse employment action"; and, many of the provisions that apply to private employers also apply to federal employers.   *See, e.g.*, *Putman*, 510 at 829.

"In the context of a retaliation claim, an adverse employment action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Malone*, 858 F. App'x at 303 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

The Eleventh Circuit has explained that "an 'adverse employment action' in the retaliation context does not carry the restrictive definition that it does in the discrimination setting.   In particular, 'the antiretaliation provision [under Title VII], unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'"  *Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 714 (11th Cir. 2013) (quoting *Burlington Northern*, 548 U.S. at 64).  "Instead, the test is whether 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Burlington Northern*, 548 U.S. at 68); *accord, e.g.*, *Rainey v. Holder*, 412 F. App'x 235, 238 (11th Cir. 2011) (federal employee plaintiff); *Crawford*, 529 F.3d at 970.

Nevertheless, "'the significance of any given act of retaliation will often depend upon the particular circumstances.   Context matters.'"  *Barnett*, 550 F. App'x at 714 (quoting *Burlington Northern*, 548 U.S. at 69).

In this regard, "'the anti-retaliation provision [of Title VII] protects an

individual not from all retaliation, but from retaliation that produces an injury or harm.'"  *Barnett*, 550 F. App'x at 714 (quoting *Burlington Northern*, 548 U.S. at 67).  "The Supreme Court stated that 'material adversity' is distinguishable from mere 'trivial harms.'"  *Id.* at 714–15 (quoting *Burlington Northern*, 548 U.S. at 68).

### B.      The court assumes without deciding that Fortner has identified sufficient evidence on the "protected activity" element of her retaliation claim.

The court assumes without deciding that Fortner has identified sufficient evidence to create a triable issue of fact for a jury on the "protected activity" element of her retaliation claim.  Generally speaking, a prima facie case of retaliation requires statutorily protected activity, such as the filing of an EEO complaint or meeting with an EEO counselor.  *See, e.g.*, *Murphree*, 644 F. App'x at 965 ("[A]n individual must contact an agency official logically connected to the EEO process and exhibit an intent to begin the EEO process.").

However, some caselaw also suggests that "Title VII protects not just 'individuals who have filed formal complaints,' but also those 'who informally voice complaints to their superiors or who use their employers' internal grievance procedures.'"  *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (quoting *Rollins v. Florida Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)).

As noted above, there is some inconsistency in the record regarding whether

Fortner filed an EEO complaint in December 2017.  *See* Doc. 51 at 11; Doc. 34 at 3 n.4.   In her response to Defendant's summary judgment motion, Fortner acknowledged that the December 2017 complaint was a union grievance (Doc. 73 at 12), and attached as an exhibit a list of her EEO complaints (Doc. 73-6); that list of EEO complaints does not include any complaint in December 2017 (*id.*). Consequently, it appears that Fortner did not file an EEO complaint in December 2017.   To the extent that this fact remains disputed, it is immaterial; the court must resolve that dispute in Fortner's favor, and also assumes that Fortner's union grievance constitutes protected activity.

With respect to the union grievance, Fortner argues that the December 2017 grievance should be considered protected activity, because that grievance stated that she had "been singled out and discriminated against," and included information about similarly situated male employees.   Doc. 73 at 27–28.   Defendant argues that Fortner's union grievance cannot "constitute the protected activity necessary to serve as the basis for a viable retaliation claim," pointing out that Fortner's grievance did not include any race- or gender-specific allegations.   Doc. 81 at 12–13 (citing *Canty v. Fry's Elec., Inc.*, 2012 WL 1038619, at *9 (N.D. Ga. Feb. 2012)); *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010)).   Again, assuming that Fortner's union grievance can constitute protected activity, the court concludes that the reference in the grievance to "discrimination," combined with information

regarding similarly situated male employees (Doc. 73 at 27–28; Doc. 73-2 at 5), would be sufficient evidence to create a jury question on the protected activity element of her retaliation claim.

### C. The evidence is insufficient for Fortner to create a triable issue of fact for a jury on the "personnel action" or "adverse employment action" element of her retaliation claim.

Regardless, the evidence is insufficient for Fortner to create a triable fact issue for a jury on the "personnel action" or "adverse employment action" element of her retaliation claim. As stated above, "the test is whether 'a reasonable employee would have found the challenged action materially adverse,'" meaning "'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Barnett*, 550 F. App'x at 714 (quoting *Burlington Northern*).

In support of her retaliation claim, Fortner points to the same alleged employment actions that she did on her discrimination claim: the letter of warning; the alleged comparator "clicks"; the alleged performance meetings or attendance reviews with Jordan; the allegedly "undesirable" work assignment to "the tunnel"; the notice of a recommended seven-day suspension, which was withdrawn; and the alleged "official discussions." *See supra* Factual Background; Part I.

As discussed above (*see supra* Background A.1, C.8), after all of the USPS's alleged employment actions that Fortner has identified, Fortner filed an EEO information for counseling form on May 22, 2018, and an EEO complaint on August

27, 2018.   Doc. 69-3 at 1, 11.   So, while the question is whether a reasonable person would have "been dissuaded," Fortner in fact was not "dissuaded" from "making or supporting a charge of discrimination."   *See Barnett*, 550 F. App'x at 714.

Moreover, an actionable "personnel action" or "adverse employment action" must "produce[] an injury or harm," and "'material adversity' is distinguishable from mere 'trivial harms.'"   *Barnett*, 550 F. App'x at 714–15 (quoting *Burlington Northern*).

While the test is different on Fortner's retaliation claim, the analysis here is consistent with the discussion above regarding her discrimination claim.   *See supra* Part I.

*First*, under the court's prior orders, none of the USPS's alleged employment actions before April 7, 2018 are actionable—e.g., the letter of warning; the alleged comparator "clicks"; some of the alleged performance meetings or attendance reviews with Jordan; some or all of the allegedly "undesirable" work assignment to "the tunnel"; and some of the alleged "official discussions."   *See* Doc. 34; Doc. 51 at 8–9.   Further, because the alleged "protected activity" is Fortner's December 2017 union grievance, any of the USPS's alleged employment actions before that union grievance cannot be actionable.   *See supra* Part II.B.   For example, the December 2017 letter of warning preceded Fortner's union grievance (*see supra* Part I.B.1), and consequently the USPS could not have issued that letter to retaliate

49

against Fortner for a grievance she had not *yet* filed.[19]   *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1245 (11th Cir. 2016) (holding that "no triable issue of causation exist[ed]" where the employer raised ethics concerns prior to the plaintiff's protected activity, even though the employer filed a formal ethics complaint after the protected activity); *Schechter v. Georgia State Univ.*, 341 F. App'x 560, 563 (11th Cir. 2009) (concluding that there was no causal connection where the alleged adverse employment action occurred before the protected activity).

*Second*, no reasonable jury could find that any of the USPS's alleged employment actions after April 7, 2018, were "'materially adverse'" to Fortner. *Barnett*, 550 F. App'x at 714 (quoting *Burlington Northern*).   Again, Fortner was not "dissuaded" from filing an EEO counseling form in May 2018.   *See Barnett*, 550 F. App'x at 714.   And, "[w]hile the jury traditionally should decide whether a defendant's actions are sufficiently adverse, 'petty and trivial' actions by the defendant are not sufficiently adverse."   *Rainey*, 412 F. App'x at 238 (quoting *Crawford*, 529 F.3d at 974 n.13).

Neither the alleged performance meetings or attendance reviews with Jordan,

---

[19] Plus (as noted above, *see supra* Background C.2), the letter of warning was rescinded after Fortner and the USPS reached a compromise.   Doc. 70 at 16; Doc. 69-16 at 1; Doc. 69-18 at 1; Doc. 73 at 12.   A letter of warning that is rescinded would not dissuade a reasonable worker from engaging in protected activity.   *E.g.*, *Hawkins v. Potter*, 316 F. App'x 957, 962 (11th Cir. 2009) (concluding on a retaliation claim that a "proposed letter of warning which was later rescinded" did not "constitute actionable adverse conduct").

the allegedly "undesirable" work assignment to "the tunnel," the notice of a recommended seven-day suspension (which was withdrawn), or the alleged "official discussion(s)" were "adverse employment actions."[20]   *See Barnett*, 550 F. App'x at 715.   There is no evidence that Fortner "suffered harm from any action that would have deterred a reasonable employee from making or supporting a charge of discrimination."   *See Barnett*, 550 F. App'x at 715 (citing *Burlington Northern*); *accord Rayner v. VA*, 684 F. App'x 911, 915 (11th Cir. 2017) (the plaintiff did not establish retaliation where she did not "point to any evidence that her pay or promotion prospects were negatively affected by the admonishment or the reprimand"); *Bush v. Regis Corp.*, 257 F. App'x 219, 222 (11th Cir. 2007) (affirming district court holding that warning letters and a shift change were insufficient to establish an adverse employment action under *Burlington Northern*); *Stokes v. Alfa Mut. Ins. Co.*, 2011 U.S. Dist. LEXIS 130736, at *9 (M.D. Ala. Nov. 9, 2011) (finding that the supervisor's "close scrutiny of [the plaintiff's] work," "additional assignments, some of which were outside the traditional scope of [the plaintiff's] responsibilities," and the plaintiff's evidence that "his hours were more closely scrutinized than those of his colleagues" would not "dissuade a reasonable

---

[20]  As with Fortner's discrimination claim, the court construes all evidence in Fortner's favor, and assumes for purposes of this motion that at least some of the alleged work in "the tunnel" occurred after April 7, 2018, and that all of the performance meetings or attendance reviews with Jordan after April 7, 2018, qualify as "official discussion(s)."   *See supra* Parts I.B.4, I.B.6.

employee" from engaging in protected activity); *Penn v. USF Holland, Inc.*, 770 F. Supp. 2d 1211, 1239 (N.D. Ala. 2010) ("The written warning letters would not dissuade a reasonable worker from making a charge of discrimination, and they did not dissuade [the plaintiff] as he continued to file grievances for many of the warning letters he received." (citing *Bush*, 257 F. App'x at 222)).

Indeed, in this case, "nothing in the record showed that these acts were materially adverse in that they would have affected any future pay raise or [Fortner's] future job status in any way.   On the contrary, the evidence established that these acts had no effect on [her] job status whatsoever."   *See Barnett*, 550 F. App'x at 715 (affirming summary judgment for the defendant).

*   *   *

Because Fortner cannot create a triable issue of fact for a jury on the required "personnel action" or "adverse employment action" element of her retaliation claim, the court does not reach the *Babb* causation standard.

**III.  There is no genuine issue as to any material fact on Fortner's claim for a retaliatory hostile work environment because Fortner cannot create a triable jury issue on the required "personnel action" or "adverse employment action" element of her claim.**

There is no genuine issue as to any material fact on Fortner's retaliatory hostile work environment claim because she cannot create a triable jury issue on the required "personnel action" or "adverse employment action" element of her claim. *See Celotex*, 477 U.S. at 322–23 (a "failure of proof concerning an essential element

52

of the [plaintiff's] case necessarily renders all other facts immaterial").

> **A.** **The** ***Babb*** **causation standard, the essential elements for a retaliatory hostile work environment claim against a federal employer, and the court's prior orders addressing the scope of Fortner's retaliatory hostile work environment claim.**

As discussed above, a plaintiff claiming retaliation must ultimately show the following:   (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal link between the protected activity and the adverse action.   *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

Consistent with the discussion above (*see supra* Part II.A), it appears that *Babb* changed the causation standard for both a retaliation claim against a federal employer, and a retaliatory hostile work environment claim against a federal employer.   *See Tonkyro*, 995 F.3d at 833; *Babb II*, 992 F.3d at 1198.   But the other essential elements remain unchanged.   *See, e.g.*, *Putman*, 510 at 829.

In particular, in *Babb II*, the Eleventh Circuit reasoned that "[t]he text of the federal-sector provision addresses 'personnel actions,' and so it seems clear enough that an actionable retaliatory-hostile-work-environment claim must describe conduct that rises to that level."   992 F.3d at 1209.

In this regard, the Eleventh Circuit has recognized that a retaliatory hostile work environment can constitute an "adverse employment action."   *See, e.g.*, *Tonkyro*, 995 F.3d at 835.

With respect to the required "adverse employment action," the Eleventh Circuit has "clarified that retaliatory hostile work environment claims are properly analyzed under the standard articulated by the Supreme Court in [*Burlington Northern*], rather than the more stringent 'severe or pervasive' standard," which otherwise applies to a claim for a hostile work environment.[21]  *Tonkyro*, 995 F.3d at 833 (citing *Monaghan*, 955 F.3d 855).

Under that *Burlington Northern* standard (as discussed above), "mistreatment based on retaliation for protected conduct—for example, making or supporting a charge of discrimination—is actionable whether or not the mistreatment rises to the level of a tangible employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Monaghan*, 955 F.3d at 861 (quoting *Burlington Northern*, 548 U.S. at 68).

Again, under *Burlington Northern*, the retaliatory hostile work environment must be "materially adverse" to the plaintiff.  *Barnett*, 550 F. App'x at 714–15

---

[21]  Until recently in the Eleventh Circuit, a plaintiff alleging a retaliatory hostile work environment claim had to establish that she engaged in statutorily protected activity, that she suffered harassment that was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment, and that there was a causal link between the two.  *See Gowski v. Peake*, 682 F.3d 1299, 1311–12 (11th Cir. 2012), *abrogated by Monaghan*, 955 F.3d at 862.  But now, "retaliatory hostile work environment claims . . . prevail if the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Tonkyro*, 995 F.3d at 836 (quoting *Monaghan*, 955 F.3d at 862).

(quoting *Burlington Northern*).   "'[M]aterial adversity' is distinguishable from mere 'trivial harms,'" and the retaliatory hostile work environment must "produce[] an injury or harm." *Barnett*, 550 F. App'x at 714–15 (quoting *Burlington Northern*).

Moreover, as noted above (*see supra* Background A.1, C.8), the court's prior orders also addressed the scope of Fortner's retaliatory hostile work environment claim.  Doc. 51 at 10–13; *see also* Doc. 34 at 7–8 (similar).  After stating the essential elements of a retaliatory hostile work environment claim, the court stated that "[a]n allegation that an employer has allowed a . . . hostile work environment to prosper embodies a single violation of an employee's right to the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship and, therefore, should be reviewed in its entirety if any part of this allegation falls within the statute of limitations period."   Doc. 51 at 10–11 (quoting *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282–83 (11th Cir. 2002)) (quotation marks omitted).

### B.    The evidence is insufficient for Fortner to create a triable issue of fact for a jury on the "personnel action" or "adverse employment action" element of her retaliatory hostile work environment claim.

The evidence is insufficient for Fortner to create a triable fact issue for a jury on the "personnel action" or "adverse employment action" element of her retaliatory hostile work environment claim.[22]   With respect to the scope of this claim, the

---

[22] As with Fortner's retaliation claim (*see supra* Part II.B), the court assumes

court's prior orders summarized the alleged "single violation" that "should be reviewed in its entirety."   Doc. 51 at 10–11 (citation omitted).   According to the court, "Fortner has alleged she was retaliated against through a letter of warning" in December 2017, and "verbal harassment regarding nonexistent attendance issues." Doc. 51 at 12 (citing paragraphs 13 and 14 of Fortner's amended complaint).   The court characterized the claim as "a single retaliatory hostile work environment claim, incorporating prior acts of retaliation between the December 2017 EEO complaint [i.e., union grievance] and May 18, 2018."   Doc. 34 at 8.[23]

But the court acknowledged that "it is possible that the ultimate facts regarding that conduct will not support a retaliatory hostile work environment claim at summary judgment"—e.g., "if there were no real consequences flowing from the letter of warning or the verbal harassment turns out to be minimal."   Doc. 51 at 12–

---

without deciding that Fortner has identified sufficient evidence to create a triable issue of fact for a jury on the "protected activity" element of her retaliatory hostile work environment claim.

[23] However, the court did rule that any alleged discipline that Fortner may have received for rules infractions still is not a proper basis for her retaliatory hostile work environment claim:   "Fortner also says she was disciplined for alleged rules infractions, between October 2, 2017, and May 18, 2018, but she bases this on her race and sex rather than retaliation.   Consequently, this cannot fairly be termed part of Fortner's retaliatory hostile work environment claim.   Instead, it duplicates the original complaint's Infractions Claim, which was dismissed with prejudice.   To the extent the amended complaint attempts to reassert the Infractions Claim as anything more than background information, Defendant's motion to dismiss is GRANTED." Doc. 51 at 12 n.8 (emphasis omitted).

13.

Practically speaking, the court views Fortner's retaliatory hostile work environment claim as alleging that the USPS retaliated against her after she filed the December 2017 union grievance, and that the alleged retaliation was the same USPS employment actions from December 2017 until May 2018 (discussed above in Parts I and II *supra*), but that those alleged employment actions are analyzed *collectively*—rather than separately—as a "single" alleged adverse employment action.  *See* Doc. 51 at 14.  Stated otherwise, the court must consider the USPS's alleged wrongful conduct going back to December 2017 (after Fortner filed her union grievance), because the limitation to conduct after April 7, 2018, does not apply on Fortner's retaliatory hostile work environment claim; and the court must consider all of the evidence regarding the USPS's alleged wrongful together as a unitary, alleged "personnel action" or "adverse employment action."

In her amended complaint, Fortner alleged that she "engaged in statutorily protected conduct," and that because of this activity "she suffered reprisals from management in the form of discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of her employment and created an abusive working environment."  Doc. 37 at 8.  And, in her opposition brief, Fortner argues that the Eleventh Circuit "has found that a series of reprimands and other negative treatment of an employee who had filed an EEOC charge could, taken

57

together, constitute adverse employment action for the purposes of presenting a prima facie case of retaliation under Title VII."  Doc. 73 at 28–29 (citing *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)).

Fortner argues further in her opposition brief that "Jordan made her come to his office on 9 separate occasions for official discussions related to non-existent attendance issues."  Doc. 73 at 29.   In this regard, Fortner appears to have limited her retaliatory hostile work environment claim to the performance meetings or attendance reviews (or "official discussions") with Jordan.

Regardless, on the record evidence, the only alleged "reprisals" and "discriminatory intimidation, ridicule, and insult" that hypothetically could have created a retaliatory hostile work environment are the same USPS employment actions discussed above, *see* Doc. 37 at 8—i.e., the letter of warning; the alleged comparator "clicks"; the alleged performance meetings or attendance reviews with Jordan; the allegedly "undesirable" work assignment to "the tunnel"; the notice of a recommended seven-day suspension, which was withdrawn; and the alleged "official discussions."   *See supra* Factual Background; Part I.

Preliminarily, the difference between the record evidence supporting this claim and the two claims discussed above is minimal.   The only conceivably retaliatory USPS conduct that *both* post-dates Fortner's December 2017 union grievance *and* pre-dates April 7, 2018, appears to be the following:   four additional

performance meetings or attendance reviews with Jordan, which the court again construes in Fortner's favor as "official discussions," on February 13 and 18, 2018, and March 13 and 20, 2018; and, possibly, some uncertain amount of additional time working in "the tunnel."   Doc. 73 at 12–14, 23, 27–28.

Furthermore, even viewing *collectively* the USPS's alleged retaliatory conduct from Fortner's union grievance in December 2017 until the noticed/recommended seven-day suspension in May 2018 (which was withdrawn), no reasonable jury could find that this alleged work environment was "hostile" and "'materially adverse'" to Fortner.   *See Barnett*, 550 F. App'x at 714 (quoting *Burlington Northern*).   As mentioned above (*see supra* Part II.C), Fortner was not "dissuaded" from filing an EEO counseling form in May 2018.   Indeed, there still is no record evidence that Fortner "suffered harm from any action that would have deterred a reasonable employee from making or supporting a charge of discrimination," and "nothing in the record showed that these acts were materially adverse in that they would have affected any future pay raise or [her] future job status in any way."   *See Barnett*, 550 F. App'x at 715.

A thorough review of the relevant caselaw demonstrates that, in this case, a handful of alleged employment actions—each of which individually is insufficient to create a jury question on the required "adverse employment action" element— still is insufficient to create a jury question on that element when considered

collectively as a whole.   Moreover, in this case, there does not appear to be any evidence of the threatening or sufficiently "hostile" behavior toward the plaintiff that ordinarily supports a retaliatory hostile work environment claim.   *Monaghan* is instructive.

In *Monaghan*, the plaintiff's supervisor "threatened both termination and possible physical harm" after learning that the plaintiff had complained about the supervisor's racist and ageist comments.   *Monaghan*, 955 F.3d at 862–63.   The supervisor also said that the plaintiff had "cut her own throat" by complaining, and threatened the plaintiff by stating that she and her boyfriend knew where the plaintiff lived, pounding her fists on a table, and stating, "how dare you make complaints against me."   *Id*. at 863.   The Eleventh Circuit determined that this conduct well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.   *Id*.

Here, the allegation that the USPS engaged in "severe and pervasive" harassment is conclusory and unsupported by the record evidence.   *See* Doc. 37 at 8.   For instance, based on the record evidence, no reasonable jury could find that Fortner's performance meetings or attendance reviews or "official discussions" with Jordan might have dissuaded a reasonable worker from making an EEO complaint. Fortner has not argued, and there is no evidence, that Jordan threatened her or used profanity.   Instead, the argument and evidence show that Fortner was required to

engage in attendance meetings, and it is undisputed that she had attendance issues. *See* Doc. 70 at 9; Doc. 73 at 3; Doc. 73-3 at 31–33; *compare Monaghan*, 955 F.3d at 863 (11th Cir. 2020) (finding that statements from a supervisor—which threatened both termination and possible physical harm—"well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"), *and Wideman*, 141 F.3d at 1456 (finding that an improper listing as a no-show for work, in combination with reprimands and a suspension, threats from a supervisor to "shoot [the plaintiff] in the head" if she called headquarters to complain, and a delay in authorizing medical treatment for the plaintiff's allergic reaction "satisfied the adverse employment action requirement for a prima facie case of retaliation"), *with Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 149 (11th Cir. 2021) (finding that statements by the plaintiff's manager that the plaintiff would be fired if she did not attend work were not "materially adverse" when there were no additional derogatory or offensive comments), *and Buckley v. McCarthy*, 2021 WL 2403447, at *8 (M.D. Ga. June 11, 2021) (dismissing a retaliatory hostile work environment claim where supervisors may have made inappropriate comments but did not use profanity toward the plaintiff and did not verbally or physically threaten her).

Thus, no reasonable jury could find that Fortner was subjected to a retaliatory hostile work environment, and the record evidence is insufficient to show a "personnel action" or "adverse employment action" on this claim.

\*        \*        \*

Accordingly, because Fortner cannot create a triable issue of fact for a jury on the required "personnel action" or "adverse employment action" element of her retaliatory hostile work environment claim, the court does not reach the *Babb* causation standard.

## CONCLUSION

The court is sympathetic to Ms. Fortner's allegations, but—based on the controlling law and record evidence—there is no genuine dispute as to any material fact for trial.   For the reasons stated above, the court **GRANTS** Defendant's summary judgment motion (Doc. 70).   The court separately will enter final judgment.

**DONE** and **ORDERED** this September 29, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE